IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-22-00196-PRW |
| ) | |
| JAIME LOPEZ-SEGURA, ) | |
| ) | |
| Defendant. ) | |

# ORDER

Before the Court are Defendant's Motion to Dismiss (Dkt. 23), seeking to dismiss Count One of the Indictment (Dkt. 12) on grounds that 8 U.S.C. § 1326 violates the Fifth Amendment's guarantee of equal protection, and the United States' Response in Opposition to Defendant's Motion to Dismiss (Dkt. 25). For the reasons stated below, the Court **DENIES** the motion.

## *Background*

After being removed from the United States in 2002, 2008, 2014, and 2016, Jaime Lopez-Segura, a citizen of Mexico, was discovered on or about April 30, 2022, within the Western District of Oklahoma. On May 17, 2022, Mr. Lopez-Segura was indicted on one count of illegal reentry after removal from the United States in violation of 8 U.S.C. § 1326(a).[1] Mr. Lopez-Segura filed a motion to dismiss, alleging that § 1326 violates the

---

[1] 8 U.S.C. § 1326(a) provides the following:

Fifth Amendment's guarantee of equal protection because it disparately affects Latinx persons and was enacted with a discriminatory purpose. Accordingly, Mr. Lopez-Segura argues § 1326 is unconstitutional as a violation of his right to equal protection under *Village of Arlington Heights v. Metropolitan Housing Development Corporation*.[2]

### *Discussion*

The parties offer two frameworks to review § 1326's constitutionality. Mr. Lopez-Segura argues the statute is unconstitutional under *Arlington Heights*, which forbids application of a statute adopted with discriminatory intent that disproportionately affects a racial or ethnic group.[3] The United States, however, asks the Court to apply rational basis review.

---

(a) In general

Subject to subsection (b), any alien who—

    (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

    (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

[2] 429 U.S. 252 (1977). Mr. Lopez-Segura states that he does not request an evidentiary hearing but suggests it as a possibility (Dkt. 23, at 5). The Court has considered the parties' briefs and exhibits and concludes that an evidentiary hearing is unnecessary.

[3] *See id.*

There is authority supporting the United States' argument that rational basis review is proper. Alienage classifications in federal statutes are indeed subject to rational basis review.[4] The Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens."[5] And faced with equal-protection challenges to § 1326 specifically, several district courts have applied that lower standard.[6] Others, however, have subjected § 1326 to the heightened standard in *Arlington Heights*.[7] Whether reviewed under rational basis or the more demanding *Arlington Heights* framework, the Court concludes that § 1326 does not violate the Fifth Amendment's guarantee of equal protection.

   A. *Rational Basis Review*

---

[4] *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Soskin v. Reinerston*, 353 F.3d 1242, 1255 (10th Cir. 2004) ("When Congress exercises [its] power[] to legislate with regard to aliens, the proper standard of judicial review is rational basis review."); *Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009) ("Although courts usually subject national-origin classifications to strict scrutiny, when such classifications involve unadmitted aliens in the immigration context, we subject them only to rational basis review.").

[5] *Demore v. Kim*, 538 U.S. 510, 522 (2003).

[6] *See, e.g.*, *United States v. Mauricio-Morales*, No. CR-21-298-R, 2022 WL 99996, at *1–2 (W.D. Okla. Jan. 10, 2022); *United States v. Amador-Bonilla*, No. CR-21-187-C, 2021 WL 5349103, at *1 (W.D. Okla. Nov. 16, 2021), *appeal pending*, No. 22-6036 (10th Cir.); *United States v. Novondo-Ceballos*, No. CR-21-383-RB, 2021 WL 3570229, at *3 (D.N.M. Aug. 12, 2021); *United States v. Gutierrez-Barba*, No. CR-19-1224-PHX-DJH, 2021 WL 2138801, at *2, *5 (D. Ariz. May 25, 2021).

[7] *See, e.g.*, *United States v. Calvillo-Diaz*, No. 21 CR 445, 2022 WL 1607525, at *4 (N.D. Ill. May 20, 2022); *United States v. Munoz-De La O*, 2022 WL 508892 (E.D. Wash. 2022); *United States v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774, at *1 (S.D. Tex. Feb. 2, 2022).

Under rational basis review, a law will be upheld if it is rationally related to a legitimate government purpose.[8] The Court has no trouble concluding that deterring illegal reentry into the United States is a legitimate purpose and that § 1326 is rationally related to that purpose. "[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."[9] Mr. Lopez-Segura's challenge thus fails under rational basis review.

B. *Arlington Heights*

Mr. Lopez-Segura asks the Court to follow *United States v. Carrillo-Lopez*[10] and find § 1326 unconstitutional under the *Arlington Heights* framework. Applying *Arlington Heights*, Mr. Lopez-Segura must demonstrate that § 1326 has a disparate impact on a protected class and that it was enacted with a racially discriminatory intent or purpose.[11] If he can make this showing, the burden shifts to the United States to "establish[] that the same decision would have resulted even had the impermissible purpose not been considered."[12] The Court concludes that even if Mr. Lopez-Segura had met his burden, the United States has shown that Congress would have passed § 1326, and its later

---

[8] *Pennell v. City of San Jose*, 485 U.S. 1 (1988).

[9] *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998).

[10] *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. Aug. 18, 2021).

[11] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).

[12] *Id.* at 270, n.21.

amendments, in the absence of any discriminatory intent. Accordingly, Mr. Lopez-Segura's challenge fails under *Arlington Heights*.

1. *Disparate Impact*

Mr. Lopez-Segura argues that "Congress had full knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised up to 99% of the tens of thousands of individuals prosecuted and convicted in the years following the law's passage." (Dkt. 23, at 30). But as the United States points out, § 1326's disparate impact on the Latinx population is "more readily explained by the geographic proximity of the border to Mexico and Latin America than by racial animus."[13] Even accepting that § 1326 disparately impacts the Latinx population, Mr. Lopez-Segura has not shown that the 1952 recodification and enactment of § 1326 was motivated in part by racial animus.

2. *Discriminatory Intent or Purpose*

*Arlington Heights* provides a non-exhaustive list of factors for determining a law's discriminatory purpose, including

> (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) any legislative departures from normal procedures or substantive procedures; and (5) the legislative or administrative history behind it.[14]

---

[13] *United States v. Morales-Roblero*, No. 3:19-mj-24442-AHG, 2020 WL 5517594, at *10 (S.D. Cal. Sept. 14, 2020) (analyzing § 1325).

[14] *Arlington Heights*, 429 U.S. at 266–68.

A challenger need only show "proof that a discriminatory purpose has been a motivating factor" in creating the law, not that the legislature's passing of the law "rested solely on racially discriminatory purposes."[15]

Before § 1326 was enacted in 1952, Congress first criminalized unlawful reentry in 1929 as part of the Undesirable Aliens Act.[16] The Immigration and Nationality Act of 1952 ("INA") again codified the unlawful reentry provision first passed in 1929 under Title 8 of the United States Code.[17] Section 1326 was subsequently amended in 1988, 1990, 1994, and 1996.

Mr. Lopez-Segura first argues that the historical background of the illegal reentry law shows a discriminatory intent or purpose. In support, he provides a detailed summary of the law's political and cultural history in the 1920s. This history includes theories of eugenics, fears of non-white immigration, and immigration quotas skewed against non-white immigrants. This disturbing history undoubtedly undergirded immigration policies during the 1920s, and Mr. Lopez-Segura asks the Court to follow the reasoning in *Carrillo-Lopez*[18] to find the later 1952 enactment tainted by the history surrounding the 1929 Undesirable Aliens Act. But as other courts have noted when considering the history of the illegal reentry law, the Court "remains unpersuaded either that the history explains why the 82nd Congress passed § 1326 some twenty-three years later or that it renders the [modern]

---

[15] *Id.* at 265–66.

[16] *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, ch. 690, 70 Congress, 45 Stat. 1551 (1929).

[17] 8 U.S.C.A. § 1326.

[18] *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1000 (D. Nev. 2021).

law presumptively unconstitutional."[19] "[T]he vast majority of the evidence of racial animus and discriminatory intent focuses on the 1929 Undesirable Aliens Act, a precursor to the modern-day Section 1326, which was undoubtedly enacted in the face of bald racial animus towards Hispanic people," but "this evidence bears little weight on Section 1326, which was officially reenacted as a felony offense in 1952 as part of the broader Immigration and Nationality Act."[20] And "[u]nlike previous piecemeal immigration legislation, the INA was a comprehensive immigration statute designed to 'revise the laws relating to immigration, naturalization, and nationality'" and to respond to a "massive, nine-hundred-page report that identified problems with current U.S. immigration policy and laid out recommendations for how best to address them."[21]

Mr. Lopez-Segura also contends that two events between 1929 and 1952 shed light on Congress's discriminatory intent in passing the INA: "repatriation drives" and the "Bracero Program." He describes the repatriation drives carried out during the Great Depression as "government-led campaign[s] of intimidation and coercion against the Latinx population in the United States," whereby an "estimated two million people of Mexican ancestry . . . where forcibly relocated to Mexico." (Dkt. 23, at 14). And in 1942,

---

[19] *United States v. Barrera-Vasquez*, No. 2:21CR98, 2022 WL 3006773, at *5 (E.D. Va. July 28, 2022); *see also United States v. Munoz-De La O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892, at *15 (E.D. Wash. Feb. 18, 2022) ("Upon review, the Court declines to embrace the 'forever tainted' argument at the heart of both the *Carrillo-Lopez* decision and Defendant's instant motion . . . .").

[20] *United States v. Suquilanda*, No. 21 CR 263, 2021 WL 4895956, at *5 (S.D.N.Y. Oct. 20, 2021) (quoting *Barrera-Vasquez*, 2022 WL 3006773, at *5).

[21] *Id.* (quoting *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1068–69 (D. Or. 2021)).

the United States began the Mexican Farm Labor Program, also known as the "Bracero Program," which was intended to bring Latinx labor into the United States "on a legal and temporary basis" but instead "exploited and subjected [them] to literally back-breaking labor precisely because of their race." (Dkt. 23, at 14). But the Court agrees with *United States v. Barrera-Vasquez* and finds that the repatriation drives and Bracero Program are not "meaningful evidence reflecting the motivations of the Congress who passed § 1326 or any of its subsequent reauthorizations and amendments."[22]

Furthermore, Mr. Lopez-Segura argues that Congress had a discriminatory intent or purpose because it used the racial slur "wetback" when passing related legislation, namely the so-called "Wetback Bill" that was under consideration contemporaneously with the 1952 Act. The United States agrees that "[t]he term is undeniably degrading" (Dkt. 25, at 16), but it contends the term referred to illegal immigrants from Mexico and not to Latinos who were in the United States lawfully. The United States says the distinction is further evinced by Senator Dennis Chavez's use of the term: Since Senator Chavez was the first Hispanic person elected to the United States Senate for a full term, "Senator Chavez would not have used the term himself if it were a derogatory term for Latinos." (Dkt. 25, at 16).

The Court disagrees with the United States that this is a distinction with a difference, but it is equally unpersuaded that the so-called "Wetback Bill" establishes that Congress acted with racial animus when it passed the separate bill containing § 1326. Mr. Lopez-Segura relies on *Carrillo-Lopez* and Professor Gonzalez O'Brien's testimony in that case,

---

[22] *Barrera-Vasquez*, 2022 WL 3006773, at *6.

but he does not show that *Congress* nicknamed the so-called "Wetback Bill" with a racist epithet or that the term featured prominently in congressional debates about that bill.[23] He also points to Deputy Attorney General Payton Ford's use of the "wetback" slur in a letter to the Chairman of the Committee on the Judiciary. "But Ford was not a member of Congress, so his use of the racial epithet does not provide evidence of Congress's intent in reenacting § 1326."[24]

Mr. Lopez-Segura also argues that § 1326's legislative history shows a discriminatory intent or purpose. In addition to the 1929 Act's legislative history, he claims that Congress's override of President Truman's veto of the 1952 INA demonstrates the racial animus behind the Act because President Truman had "explicitly call[ed] out the law for its racism." (Dkt. 23, at 24). "Although President Truman explained that he believed the INA 'perpetuate[d] "racial or national barriers to naturalization,"' his primary concern was about the quota system, and there is inadequate record evidence of his thoughts specifically about § 1326."[25] Congress's override of President Truman's veto thus does not

---

[23] *See United States v. Calvillo-Diaz*, No. 21 CR 445, 2022 WL 1607525, at *4 (N.D. Ill. May 20, 2022) (examining *Carrillo-Lopez* and stating that, "[a]s far as the Court can tell, the defendant identifies one Senator (McFarland, of Arizona) as using the epithet, and no one else") ("The notion that one senator's stray remark can ascribe racist intent to a whole deliberative body has been rejected by the Supreme Court." (citing *U.S. v. O'Brien*, 391 U.S. 367, 383–84 (1968)).

[24] *United States v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774, at *5 (S.D. Tex. Feb. 2, 2022).

[25] *Id.* at *4; *see also Machic-Xiap*, 552 F. Supp. 3d at 1075 ("President Truman's full statement reveals that his concern with the INA mostly was about the INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe, not with its treatment of immigrants from Latin[] America. President Truman's statements, thus, do not prove that racial animus motivated Congress to enact § 1326."); *Calvillo-Diaz*,

support Mr. Lopez-Segura's argument that Congress enacted the INA in part due to racial animus.

Finally, Mr. Lopez-Segura argues that procedural irregularities leading up to the INA's enactment show Congress's discriminatory intent and purpose. He focuses again on the discriminatory debates surrounding the 1929 Act, but as discussed above, the Court is unpersuaded that the 1929 Act's history shows that Congress acted with the same intent in 1952.[26] He also contends that Congress enacted the 1952 Act with racial animus because the "Wetback Bill" "criminaliz[ed] . . . Mexican immigrant laborers while shielding employers," (Dkt. 23, at 26), but the Court does not find merit to this argument.[27] In addition, Mr. Lopez-Segura claims that Congress's "lack of discussion of the unlawful reentry provision of the INA suggests an acceptance of its racist history, . . . expanding a law it knew disparately impacted Latinxs." (Dkt. 23, at 27–28). Thus, he argues, Congress's silence evinces racial animus. "[B]ut that silence has no probative value for determining the intentions of a deliberative body like Congress. The evidence the defendant uses to try

---

2022 WL 1607525, at *10 ("President Truman didn't mention § 1326; instead, his objection had to do with the retention of the quota system, so the veto statement does nothing for the defendant's argument.").

[26] *See United States v. Maldonado-Guzman*, No. 21 CR 448 (CM), 2022 WL 2704036, at *2 (S.D.N.Y. July 12, 2022) ("*Arlington Heights* directs the Court to look at the motivation behind the official action being challenged, which is not the 1929 Act in this case, but rather § 1326 from the 1952 INA." (internal quotations omitted)).

[27] *See Calvillo-Diaz*, 2022 WL 1607525, at *10 ("But even if this anti-harboring provision represents a victory for employers over an overwhelmingly Latin American group of workers, that itself does not show discriminatory purpose. The defense still must show that one interest group's victory over another was the result of a racially discriminatory purpose . . . . Nor does the defense address the fact that § 1326 now coexists with stringent requirements on employers, complete with criminal penalties.").

10

to fill that silence is suggestive, but far from conclusive, and falls well short of overcoming the presumption that Congress acted in good faith."[28]

The Court concludes that Mr. Lopez-Segura has not met his burden under *Arlington Heights* and joins the other courts[29] who have declined to follow *Carrillo-Lopez* in finding § 1326 unconstitutional. However, even if he had satisfied his burden under *Arlington*

---

[28] *Id.*

[29] *United States v. Barrera-Vasquez*, No. 2:21CR98, 2022 WL 3006773 (E.D. Va. July 28, 2022); *United States v. Maldonado-Guzman*, No. 21 CR 448 (CM), 2022 WL 2704036, at *2 (S.D.N.Y. July 12, 2022) ("[This] challenge to [§ 1326] is one of many similar challenges that defendants have filed across the United States after a single ruling by a court sitting in the District of Nevada."); *United States v. Santos-Reynoso*, No. 21-CR-268-LTS, 2022 WL 2274470, at *2 (S.D.N.Y. June 23, 2022) ("Since the *Carrillo-Lopez* decision was issued, it has been widely criticized, and district courts across the United States, including two courts sitting in this District, have found the *Carrillo-Lopez* decision to be an 'outlier' and upheld Section 1326 as constitutional."); *United States v. Salas-Silva*, No. 320CR00054RCJCLB, 2022 WL 2119098, at *1 (D. Nev. June 13, 2022) ("[F]ollowing the decision in *Carrillo-Lopez*, the reasoning of that decision has been addressed by numerous district courts, none of whom have followed [it]."); *United States v. Porras*, No. 21 CR 00158, 2022 WL 1444311, at *2 (N.D. Ill. May 6, 2022) ("Other courts have accurately labeled *Carrillo-Lopez* an 'outlier' decision."); *United States v. Munoz-De La O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892, at *15 (E.D. Wash. Feb. 18, 2022); *United States v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *United States v. Sifuentes-Felix*, No. 21-CR-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022); *United States v. Maurico-Morales*, 2022 WL 99996 (W.D. Okla. Jan. 10, 2022); *United States v. Sanchez-Felix*, 2021 WL 6125407 (D. Colo. Dec. 28, 2021), *reconsideration denied*, 2022 WL 159814 (D. Colo. Jan. 18, 2022).

*Heights*, the Court still finds that the United States has demonstrated that Congress would have enacted § 1326 without a discriminatory purpose. Most significantly, Congress has amended § 1326 four times since 1952, and Mr. Lopez-Segura does address any purported racial animus in these amendments.[30] The United States also shows that when Congress enacted the Immigration and Nationality Act of 1965,[31] which explicitly precluded discrimination based on race in issuing immigrant visas and abolished the national-origin quota system, Congress did not repeal § 1326. (Dkt. 25, at 21). The Court agrees with the United States that this suggests Congress considered § 1326 necessary and appropriate despite any possibility that racial discrimination was a motivating factor behind the INA. In addition, Congress enacted the Immigration Reform and Control Act of 1986,[32] which bolstered criminal penalties for those who illegally transport aliens across the border and for businesses that make a pattern or practice of hiring illegal aliens. (Dkt. 25, at 21). These penalties reinforced existing immigration laws like § 1326, suggesting that Congress accepted § 1326 and other immigration statutes then in effect.

### *Conclusion*

The Court concludes that Mr. Lopez-Segura's challenge fails under both rational basis review and the heightened standard of *Arlington Heights*. But even if he had carried

---

[30] *See Maldonado-Guzman*, 2022 WL 2704036, at *5 ("Congress has amended § 1326 several times since its original enactment in 1952 in order to increase [Section 1326's] deterrent value with nary a word suggesting discriminatory animus to those of Latin American descent." (internal quotations omitted)).

[31] Pub. L. 89-236, 79 Stat. 911 (1965).

[32] Pub. L. 99-603, 100 Stat. 3359 (1986).

12

his burden under *Arlington Heights*, the United States has demonstrated that it would have enacted § 1326 even without a discriminatory purpose. Accordingly, Mr. Lopez-Segura's motion is **DENIED**.

**IT IS SO ORDERED** this 6th day of September 2022.

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE